**In re KORS, INC., Debtor.**

**David D. ROBINSON, Esquire, Trustee, Plaintiff,**

**v.**

**The HOWARD BANK, Rutland Industrial Development Corporation, and Small Business Investment Corporation of Vermont, Inc., Defendants.**

**Bankruptcy No. 80–255.**
**Adv. No. 82–0023.**

United States Bankruptcy Court, D. Vermont.

June 21, 1985.

David D. Robinson, Rutland, Vt., trustee.

Jerome I. Meyers, White River Junction, Vt., for trustee.

James S. Abatiell, Rutland, Vt., for Rutland Indus. Development Corp.

Donald Hackel, and William C. Dagger, Rutland, Vt., for The Howard Bank.

Andrew R. Field, Montpelier, Vt., for Small Business Investment Corp. of Vermont, Inc.

## MEMORANDUM OPINION

CHARLES J. MARRO, Bankruptcy Judge.

The matter is before the court on the amended complaint of the trustee to avoid certain security interests in property of the debtor. Certain counterclaims and cross-claims are also before the court. Continued hearings after notice were held from time to time. From the records in the case, the stipulation filed, and the testimony adduced at the hearings, the facts set forth below have been established.

## FACTS

The debtor, Kors, Inc. (Kors), was a plastics manufacturer in Rutland, Vermont. Deeply in debt, Kors filed a voluntary petition under chapter 11 of the Bankruptcy Code (Code) on November 24, 1980. The case was converted to a chapter 7 liquidation on August 14, 1981 with David D. Robinson appointed as trustee.

Kors' largest creditor was the Small Business Investment Corporation of Vermont, Inc. (SBIC). As evidenced by promissory notes given by Kors to SBIC, SBIC loaned working capital to Kors as follows:

| DATE | LOAN PROCEEDS | NOTE PRINCIPAL |
|---|---|---|
| June 19, 1978 | $400,000 | $100,000 |
| | | 300,000 |
| November 26, 1979 | 100,000 | 75,000 |
| | | 25,000 |
| March 10, 1980 | 300,000 | 75,000 |
| | | 225,000 |
| August 1, 1980 | 200,000 | 150,000 |
| | | 50,000 |
| | $1,000,000 | $1,000,000 |

In connection with the 1978 loan Kors and the Rutland Industrial Development Corporation (RIDC), who was lessor to Kors of certain manufacturing equipment, joined together to execute a security agreement encumbering the leased equipment in favor of SBIC. In 1979 and 1980 Kors and RIDC amended the 1978 security agreement to collateralize the 1979 and 1980 SBIC-Kors loans with the following security:

all ... tangible property ... now or hereafter acquired, including all such property as may be leased to [Kors] by Rutland Industrial Development Corporation; accordingly, said Rutland Industrial Development Corporation joins in the execution of this agreement for the sole purpose of granting to [SBIC] a security interest in the aforementioned property [which security interest] shall be subject and subordinate to the effect to be given to any ... security interests ... given to The Howard Bank.

Kors and RIDC each signed separate financing statements and SBIC as secured party timely perfected its security interest by filing in accordance with Vermont law.

RIDC as lessor and Kors as lessee executed the equipment lease agreement on June 19, 1978, being the day SBIC made its first loan to Kors. However, at the time of entering into the lease, RIDC did not own the equipment it promised to lease. To finance the purchase of the equipment and the purchase of additional equipment which was the subject matter of certain subsequent amendments to the lease, RIDC borrowed funds from the Howard Bank (Bank) as follows:

| DATE | LOAN PROCEEDS | NOTE PRINCIPAL |
|------|---------------|----------------|
| July 12, 1978 | $1,510,000 | $1,359,000 |
| | | 151,000 |
| October 30, 1979 | 176,000 | 158,400 |
| | | 17,000 |
| December 20, 1979 | 750,000 | 675,000 |
| | | 75,000 |
| | $2,436,000 | $2,436,000 |

In connection with each loan, Kors and RIDC joined together as "DEBTOR" to execute a security agreement in favor of the Bank. As provided in each security agreement, the collateral as to each Bank-RIDC loan consisted of "... equipment and machinery to be purchased by Rutland Industrial Development Corporation from Refenhauser U.S.A. Sales Corp...."

Subsequent to each Bank-RIDC loan transaction, the Bank as secured party filed financing statements signed by RIDC as debtor with the Rutland city clerk and the Secretary of State. The financing statements RIDC signed described the encumbered property as "certain equipment and machinery owned by the Debtor ... as described in part in a Security Agreement.... by and between the Debtor, Kors, Inc., and the Secured Party." A list of the items of machinery purchased with the first and second Bank-RIDC loans was filed as attached to the RIDC-Bank financing statements signed in connection with those loans. No such list of items purchased with the third loan was filed in connection with that loan. No security agreement describing the collateral was filed in connection with any of the RIDC-Bank financing statements. The Bank never requested Kors to sign nor did Kors sign any financing statement in favor of the Bank. No financing statement in favor of the Bank was ever indexed under the name Kors, Inc., at any recording office.

Every financing statement filed by SBIC or the Bank indicated that the subsisting security interests extended to proceeds of collateral. SBIC's security interest was subordinate to that of the Bank with respect to items encumbered in favor of both creditors, as provided by the text of the SBIC financing statements, and by the text of a subordination statement SBIC filed with the Rutland city clerk. Every financing statement filed by SBIC or the Bank with the Secretary of State was stampmarked "SUBORDINATION" by the recording office.

The documentation in the case indicates that SBIC subordinated its security interests to the Bank's security interests with respect to certain equipment. Equipment and machinery with respect to which SBIC did not subordinate its security interests of the Bank included:

Two $25,000.00 embossers (total $50,000.00);

A $45,000.00 slitting machine;

An $85,000.00 regrind line;

Sundry equipment not including an air lift compressor or pieces designated HBS 500, HPS 500, HVS 500, value not established;

Certain "miscellaneous items conveyed" by the trustee; and

Certain office equipment conveyed by the trustee for the sum of $3,424.00.

Kors exclusively negotiated purchase and sale agreements with Reifenhauser, U.S.A. (Rextrusion) concerning the machinery which was the subject matter of the RIDC-Kors lease as amended to encompass, as leased property, all major items of machinery on Kors' premises. As to each purchase and sale, Rextrusion as vendor delivered the equipment directly to Kors' factory under documents of sale identifying Kors as buyer, and Rextrusion obtained its purchase price from proceeds of the Bank-RIDC loans. Kors also exclusively negotiated purchase and sale agreements with vendors other than Rextrusion where Rextrusion could not supply required equipment. Like Rextrusion, such other vendors made delivery directly to Kors under documents of sale showing Kors as buyer, and such vendors obtained their purchase price from proceeds of the Bank-RIDC loans.

RIDC asserted ownership as to the equipment it paid for only by providing in the RIDC-Kors lease that Kors "... agrees to place a suitable notice in the form of a plaque on each major item of equipment ... indicating that it is the property of Rutland Industrial Development Corporation on lease to Kors, Inc." However, Kors did not affix, nor did RIDC otherwise demand that Kors affix, any such notice as contemplated by the lease. Further, although the RIDC-Kors-Bank security agreements provided that, "the collateral is or will be owned by Rutland Industrial Development Corporation ...," RIDC never requested Kors to execute, nor did Kors ever execute, subsequent to any vendor's delivery to Kors of equipment, (1) any transfer to RIDC of any interest Kors may have had in such equipment or (2) any document of title or document representing title to such equipment.

On April 22, 1982, the bankruptcy trustee sold all the equipment pursuant to court order. The trustee realized proceeds as follows:

| ITEM NO. | DESCRIPTION | VENDOR | VALUE |
| --- | --- | --- | --- |
| 1–5 | extruders | Rextrusion | $ 580,000 |
| 6 | Sterling regrind line | Eastern Engraving | 85,000 |
| 7 | vertimat | Rextrusion | 10,000 |
| 8–11 | intermats | Rextrusion | 240,000 |
| 12, 13 | embossers | Vendor other than Rextrusion | 50,000 |
| 14 | printing press | Rextrusion | 60,000 |
| 15 | slitting machine | Dusenberg proceeds | 45,000 |
| 16 | Sundries | various vendors | 30,000 |
| | | | $1,100,000 |

All proper parties consented to the sale prior to the day of sale. The court confirmed the sale on July 14, 1982.

The text of the purchase agreement executed prior to sale by the buyers, Hilinex Holdings, Inc. and Himolene California, Inc. fixed the values the trustee received for the equipment transferred by the sale.

The text of the agreement identified in twenty-seven lines, the equipment to be sold. The trustee's bill of sale, by way of contrast, identified the equipment sold in a six-page list which included not only the major pieces of machinery but also the attachments, accessions, and other incidental items associated with the operation of

the major pieces. Notably, item 16 of the purchase and sale agreement was described as "16". Sundries A. Lemo Stamp Out Unit, B. Lemo Blocking/Stamp Out Units, C. Air Compressor, D. 4 Fork Lift/Pallet Trucks, whereas the text of the purchase agreement identified "Sundry Equipment" in a 25-line itemization including a concrete mixer, a welding machine, three scales, four air shafts, 12 fire extinguishers, a loading ramp, a static bar and power unit, four level dollies, one blower, two sealers, a stapling machine, and assorted tools. In connection with this sale the trustee also quitclaimed his interest in a transformer that Kors had purchased for a sum in excess of $16,000 during Kors' period of operations.

This discrepancy in the itemization of the equipment as contained in the purchase agreement and as contained in the trustee's bill of sale is academic, however, for the reason that all parties including the SBIC consented to the sale on the basis of the detailed itemization contained in the trustee's bill of sale.

Upon the event of sale, the Bank (1) retired $1,000,000 of RIDC's indebtedness created in connection with the purchase, in the first instance, of the subject equipment, and (2) financed $1,000,000 of the Hilinex-Himolene purchase price. Additionally, $100,000 changed hands to complete the Hilinex-Himolene purchase price of $1,100,000. The cash was deposited in an interest-bearing escrow account. As to sale proceeds represented by the $1,000,000 of retired RIDC indebtedness, (1) no deposit in escrow was contemplated by the parties or made in fact and as a practical matter the Bank has had the beneficial use and enjoyment of these funds since the date of sale, and (2) no agreement as to the payment of interest on such amount was made by any party entitled to share in the proceeds of the trustee's sale.

During the period of Kors' operations, no accessions, additions or substitutions were made in regard to any of the Bank's collateral.

Kors' petition listed debts, *inter alia*, as follows:

| CREDITOR | CLAIM | STATUS |
|---|---|---|
| RIDC | $3,125,000 | secured |
| SBIC | 817,000 | secured |
| Bank | 305,000 | secured |

The proofs of claim set out the indebtednesses as follows:

| CREDITOR | CLAIM | STATUS |
|---|---|---|
| RIDC | $2,672,134.78 | unsecured |
| SBIC | 936,870.77 | secured |
| Bank | $,591,841.15 | secured |

The RIDC-Kors equipment lease was for a term of ten years, being the estimated useful life of the leased equipment. The rent under the lease was absolute, being an amount equal to the indebtedness created by RIDC in connection with the Bank-RIDC enabling loans. Under the lease, RIDC was to hold legal title to the subject matter of the leasehold, and Kors was to be the equitable or beneficial owner.

The lease contained a purchase option clause under which Kors could purchase the leased property at any time prior to the termination of the lease or within 120 days following the termination, for one dollar "plus the aggregate sum required to prepay in full the Lessor's unpaid indebtedness [to the Bank], together with any other pecuniary obligations as may be due and owing by Lessee to lessor under the provisions of this lease ... The purchase option interest of the Lessee hereunder shall be protected by the filing of U.C.C. financing statements ..." Neither RIDC nor Kors filed any financing statements in connection with the lease transaction.

The unpaid balances under the aforesaid loans from the Bank and SBIC as of the date of the filing of the Petition for Relief on November 28, 1980 are:

| The Howard Bank | $2,591,841.15 |
|---|---|
| SBIC | 804,943.95 |

Interest accrues on The Howard Bank loans at the rate of $778.62 per diem and the interest on the SBIC loans up to May 1, 1984 amounts to $413,810.50 so that the total indebtedness to SBIC loans up to May

1, 1984 amounts to $413,810.50 so that the total indebtedness to SBIC as of May 1, 1984 was $1,218,754.45.

## DISCUSSION

The issues before the court are:

(1) Whether the RIDC-Kors lease was a true lease or, alternatively, a financial lease intended to have effect as security;

(2) Whether on bankruptcy day the Bank as secured party was perfected as against Kors;

(3) The extent of collateral in which SBIC has a perfected security interest.

■ The nature of a creditor's property rights in bankruptcy is defined by state law, not federal law. *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136; *In Re Skelly Jr.* (U.S. District Court—D. Delaware—1984), 38 B.R. 1000, 1001.

Therefore, the rights of the Bank and of SBIC are controlled by the pertinent sections of the Uniform Commercial Code as adopted in this state.

## THE LEASE

■ Whether a lease is intended as security is to be determined by the facts of each case; however, an agreement that upon compliance with the terms of the lease the lessee shall have the option to become the owner of leased property for no additional consideration or for a nominal consideration, makes the lease one intended for security. 9A Vermont Statutes Annotated ("U.C.C.") § 1–201(37).

The RIDC-Kors lease granted Kors an option to purchase the leased equipment, provided Kors:

(1) Liquidated its monetary obligations under the lease, being payment in the amount of the enabling loan indebtedness as created by RIDC in favor of the Bank, and additionally,

(2) Paid one dollar.

Thus, the lease contained a purchase option exercisable by the lessee for a nominal consideration upon compliance with the relevant material terms of the lease. Under U.C.C. section 1–201(37) this lease is not an operating lease but is a capital lease intended to have effect as security. See *In re Catamount Dyers, Inc.*, 43 B.R. 564 (Bankr.D.Vt.1984); *see also In re J.A. Thompson & Son, Inc.*, 33 U.C.C.Rep.Serv. 356 (9th Cir.1982); *see generally* U.C.C. Case Dig. (Callaghan) ¶ 1201.37(7); *In re Mountain Carpet, Inc.*, 11 B.R. 729 (Bankr.D.Vt.1979).

## THE SECURITY INTEREST OF THE BANK

■ Vermont law permits perfection of a secured party's interest in collateral, U.C.C. § 9–302, by the filing, *id.* § 9–304, of a financing statement, *id.* § 9–403, signed by the debtor, *id.* § 9–402(1). Generally, if these steps are not taken, the security interest remains unperfected and as such is subordinate to the property right of the bankruptcy trustee. *id.* § 9–301; Bankruptcy Code §§ 541(a), 544, 551.

■ Whether the Bank was perfected as against Kors turns on whether the Bank's financing statements were "signed by the debtor" in accordance with Vermont law. Kors purchased the equipment and thereby became the owner. As owner it became the debtor who was required to sign the financing statement and without its signature affixed thereto the security interest of the bank was not perfected. *Southwest Bank of Omaha v. Moritz* (Nebraska Supreme Court—1979) 26 U.C.C.Rep.Ser. 231. In fact the financing statements were executed by RIDC and not by Kors. As owner of the collateral execution of the financing statements by Kors was ingredient to perfection of the Bank's security interest. *In Re Beech* (Bankr.S.D.Ala.1976) 2 B.C.D. 524; *In Re Murray* (Bankr.D.Oregon 1964) 2 U.C.C.Rep.Ser. 667.

It has been determined that execution of a financing statement by less than every person identified as a debtor in the underlying security agreement is not a minor error under U.C.C. section 9–402(5), with the result that the security interest is unperfect-

ed as against such transactional debtors as do not sign the financing statement. *In re Davison* 29 B.R. 987 (Bankr.W.D.Mo.1983) (failure to identify as a debtor on financing statement, and to obtain signature on financing statement, of security agreement joint signatory, held fatal to perfection of security interest); *See In re Industro Transistor Corp.,* 14 U.C.C.Rep.Serv. 522 (Bankr.E.D.N.Y.1973); *see also In re Murray,* 2 U.C.C.Rep.Serv. 667. It is noted that the relevant financing statements identified as debtor RIDC but not Kors. The point here is that "[t]he secured party, not the debtor or uninvolved third parties, has the duty of insuring proper filing and indexing ..." *In re Thomas,* 466 F.2d 51, 93 (9th Cir.1972).

For the reason that the Bank did not file any financing statement signed by Kors, the Bank's security interest is subordinate to the rights of the bankruptcy trustee. Under Section 544 of the Bankruptcy Code a trustee in bankruptcy, as of the commencement of a case, has the rights and powers of a judicial lien creditor on all property on which a creditor could have obtained a judicial lien, whether or not such a creditor exists. As a result, the rights of the trustee as a lien creditor as of the date of bankruptcy are superior to those of the Bank in the collateral. § 9–301(3) of the Uniform Commercial Code. See also *In Re Rutland Tile Center, Inc.* (Bankr.D.Vt. 1968) 5 U.C.C.Rep.Ser. 1115; *In Re Jerome* (Bankr.D.Vt.1983) 31 B.R. 266.

The Bank argues that the financing statements on file, especially those recorded by SBIC, satisfied the "notice filing" requirements of the U.C.C. and are fully effective against creditors of Kors including the trustee. It relies on the description of the collateral in the financing statement filed by SBIC which contains the language "all subject, however, to the effect to be given to a previous security interest granted to The Howard Bank." This language, it asserts, satisfied the requirements of such notice since it indicated that The Howard Bank held a security interest in collateral and subsequent creditors were obligated to inquire as to the extent of the Bank's

security interest. In effect the Bank seeks a free ride on the coattails of SBIC which took the proper steps to perfect its security interest by filing financing statements in the proper places with both Kors, Inc., and RIDC listed as debtors.

There is some degree of liberality and flexibility afforded under the U.C.C. in dealing with the description of collateral as it appears in financing statements filed to perfect security interests. See *In Re Malzac* (Bankr.D.Vt.1974) 14 U.C.C.Rep.Ser. 1223, 1226 where the Court said:

"It is noted that under the comments pertaining to this section, the test of sufficiency of a description is that the description do the job assigned to it—that it make possible the identification of the things described. And, under this Rule, courts should refuse to follow the holding, often found in the old chattel mortgage cases, that descriptions are insufficient unless they are of the most exact and detailed nature, the so-called 'serial number' test. It necessarily follows that under the Uniform Commercial Code great liberality is afforded in determining the sufficiency of the description of collateral. This view seems to have unanimous support in the reported cases relating to the issue. The test seems to be that if the description of the collateral is sufficient to direct inquiry on the part of the party examining it the requirements of the UCC as to constructive notice have been met. *First State Bank of Nora Springs, Iowa v. Waychus* (Iowa Sup Court 1971) 8 UCC Rep Service 762, 765; *Ray v. City Bank & Trust Co. of Natchez, Mississippi* (USDCSD Ohio 1973) 13 UCC Rep Ser 355, 358 F Supp 630; *Donald v. Madison Industries, Inc.* (USCA 10th Cir, 1973) 483 F2d 837 [13 UCC Rep 918]; *Biggins v. Southwest Bank* (USCA 9th Cir.1973) 13 UCC Rep Ser 928."

And in the case of *In Re Excel Stores, Inc.* (CCA 2d Cir.1965) 2 U.C.C.Rep.Ser. 316 the Court pointed out that the purpose of § 9–402 of the U.C.C. relating to the

formal requisites of a financing statement is only to "give the minimum information necessary to put any searcher on inquiry." See also *In Re My Place or Yours, Inc.* (Bankr.D.Vt.1983) 34 B.R. 197.

It is abundantly clear that this liberality of construction is confined to the requirements relating to the description of collateral which is only one of the requisites of a financing statement prescribed by § 9–402 of the U.C.C. In addition, this section provides that a financing statement, to be sufficient, must be signed by the debtor and the secured party. It follows that if the Bank is to establish a perfected security interest it must paddle its own canoe and cannot rely on any financing statement signed by Kors, Inc., as debtor and SBIC as secured party and filed in the proper places, the effect of which was to create a perfected security interest in favor of SBIC. At most the reference in such financing statements of a previous security interest granted to The Howard Bank would have required a subsequent creditor to search the filing records of the City of Rutland and of the Secretary of State to ascertain whether there were in fact financing statements filed with Kors, Inc., listed as debtor and the Bank as secured party sufficient to create a perfected security interest in favor of the Bank. It is obvious that such a search would have disclosed no such financing statements indexed and filed since none was ever executed by these parties. Such being the case The Howard Bank does not hold a perfected security interest in any collateral. § 9–402 U.C.C.; *In Re My Place or Yours, Inc.*, 34 B.R. 197, 198; *In Re Davison*, supra; *In Re Industro Transistor Corp.*, supra; *In Re Granite City Creamery Association, Inc.* (Bankr.D.Vt.1970) 7 U.C.C. Rep.Ser. 1083 affirmed (U.S.District Court, Vt.1970) 8 U.C.C.Rep.Ser. 393; (CCA 2d Cir.1973) 9 U.C.C.Rep.Ser. 102.

Even assuming arguendo that the reference to a previous security interest of The Howard Bank in the financing statements filed by SBIC was sufficient to put a creditor on notice of the existence of such interest the bank is still precluded from prevailing as against the trustee. U.C.C. Code § 9–301(1)(b) makes an unperfected security interest subordinate to a person who becomes a lien creditor *without knowledge* of the security interest and before it is perfected. Underscoring supplied.

A "lien creditor" includes a trustee in bankruptcy from the date of the filing of the petition. § 9–301(3). "Knowledge" of an unperfected security interest by a trustee in bankruptcy under this § 9–301 means actual knowledge of the security interest by every creditor of the debtor. *In Re Dennis Mitchell Industries, Inc.* (C.C.A. 3d Cir.1969) 419 F.2d 349, 6 U.C.C.Rep.Ser. 573; *In Re The Third Eye, Inc.* (U.S.District Court, S.D.N.Y.1974) 15 U.C.C.Rep.Ser. 1152. Since the Bank did not offer any evidence proving that every creditor of the debtor had knowledge of its security interest, the trustee took without knowledge and his interest as a lien creditor prevails over that of the Bank. Id.

The cases cited by the Bank are not persuasive. *In Re King* (Bankr.E.D.Tenn. 1981) 31 U.C.C.Rep.Ser. 697 is not apposite. Perfection of the security interest in the collateral (a trailer) was defective because of the failure to incorporate the name of the secured party on the title certificate. However, the court ruled against the trustee in bankruptcy since perfection did in fact occur by taking possession which is permissible as an exception to filing under § 9–305 of the U.C.C.

The Bank relies heavily on *In Re Tele/Resources, Inc.* (Bankr.S.D.N.Y.1982) 21 B.R. 358, but this reliance is misplaced. The issue confronted by the *Tele/Resources, Inc.* court can hardly be considered as identical to the one in the instant case. In *Tele/Resources, Inc.* the debtor had granted a security interest in certain general intangibles which included tax refunds to Citibank as security for substantial loans made by Citibank to the debtor. Citibank perfected its security interest by filing financing statements in the proper places. Subsequently the debtor was in need of additional operating cash which

Citibank refused to advance. The debtor was successful in prevailing upon Newmarket, with Citibank's knowledge, encouragement and agreement, to lend it $250,000.00 secured by the debtor's 1977 tax refund. This loan was rolled over, with knowledge, agreement and consent of Citibank, with payment to be made by Tele/Resources' anticipated 1980 federal tax refund. Newmarket did not file any financing statements to perfect its security interest.

Newmarket contended that it did not perfect its security interest in the tax refund but that it was entitled to payment of its $250,000.00 loan prior to any payment to Citibank on the basis that Citibank had subordinated or assigned its secured senior interest. The court upon construing the facts and applying the New York law concluded that there was no assignment or subordination by Citibank, and, therefore, Newmarket's position was untenable.

The debtor, in an attempt to feather its own nest, asserted that Citibank had "released" a portion of its security interest to Newmarket by subordination (the court concluded the contrary) and, since Newmarket had not perfected its security interest, the debtor could as a hypothetical lien creditor, pursuant to Code §§ 544 and 1107, defeat Newmarket's interest for the benefit of the creditors of the estate. In effect, the debtor was asserting that not even Citibank retained a security interest in the collateral thereby attempting to bite the hand that fed it. The court addressed this fallacious argument in the following language at 21 B.R. page 363:

"Although the debtor cannot find any authority to support this novel theory, the court need not tarry with the debtor's argument in this case because, as between the debtor and Citibank, it matters not whether Newmarket's position is based on the theory of subordination or assignment. A subordination by Citibank in favor of Newmarket is no more a release of its perfected secured position to any other parties than is an assignment. Whatever rights Newmarket may claim as a result of its dealings with the debtor may not detract from Citibank's position vis a vis the debtor that it holds a perfected interest in the debtor's tax refunds and that there are no written documents executed by Citibank to the contrary. Hence, Newmarket's claim to a subordination or assignment from Citibank by estoppel, waiver, silence, conduct of the parties or whatever, cannot serve as an erosion of Citibank's perfected claim as to any other parties, including the debtor." Underscoring supplied.

The Bank can find no solace in the foregoing language which it has quoted in its supplemented memorandum for the reason that it is clear that the court was dealing with the rights of the debtor "vis a vis" those of Citibank which had perfected its security interest which the court held could not be extinguished. This the court stressed by indicating that "a subordination by Citibank in favor of Newmarket is no more a release of its perfected secured position to any other parties than is an assignment." It is clear that the issue in *Tele/Resources, Inc.* is entirely different from that in the instant case.

The Bank stresses that a subordination agreement is enforceable whether it be oral, informal and even inferred from the conduct of the parties. There is no quarrel with this observation. Further, there is no requirement that an assignment of a security interest must be filed in order to be effective against creditors of the debtor. U.C.C. § 9–302(2) specifically provides that such filing is not necessary. However, in the instant case there has been no claim made that the subordination by SBIC in favor of the Bank's security interest was in the nature of an assignment since it was not. The crucial issue is not the validity of SBIC's perfected security interest as against the trustee as a hypothetical lien creditor under Code § 544 but rather the Bank's right to enforce an unperfected security interest as of the date of bankruptcy against the trustee as such lien creditor. Since it failed to perfect the Bank cannot prevail.

## RIGHTS TO THE COLLATERAL

The bankruptcy trustee who successfully avoids a creditor's interest in property steps into the shoes of such creditor and inherits the avoided property interest for the benefit of general creditors. Code § 551. As the instant trustee is entitled to avoid, under Code section 544, the unperfected security interest of the Bank, that interest is preserved intact in the bankruptcy estate pursuant to Code section 551. Thus the Bank's collateral is property of the estate unencumbered by the Bank's security interest. See *In re Vermont Fiberglass, Inc.*, (Bankr.D.Vt.1984) 44 B.R. 505; (Bankr.D.Vt.1984) 45 B.R. 603; *In Re Steele* (Bankr.W.D.Wis.1983) 27 B.R. 474, 479; *In Re Barry* (Bankr.S.D. Ohio E.D. 1983) 31 B.R. 683, 686 in which the court asserts that the purpose of Code § 551 is to allow the trustee in bankruptcy, upon avoidance of certain preferential or fraudulent transfers, to increase the assets of the bankruptcy estate. The Barry court further pointed out that the enactment of this section assures that a junior lienor shall not be able to improve its position because a trustee has successfully avoided a lien or transfer. Citing, *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133. In effect, the trustee is subrogated to the rights of the transferee in the avoided transfer or the lien creditor with the avoided lien. *Egyption Supply Co. v. Boyd*, 117 F.2d 608 (6th Cir.1941). Although preservation of avoided liens and transfers is no longer discretionary with the Court under the provisions of the Bankruptcy Reform Act of 1978, but rather is provided for automatically by 11 U.S.C. § 551, the effect of such preservation under the Bankruptcy Act of 1898 remains relevant. *In Re Barry*, supra, at page 686.

The Court must determine to what extent the collateral of SBIC as a perfected secured creditor and the erstwhile collateral of the Bank consist of mutually exclusive pieces of equipment. On the facts, SBIC has a perfected security interest in all Kors' personal property "subject, however, to the effect to be given to security interest[s] granted to the Howard Bank."

The Bank had a security interest in—which is to say the bankruptcy trustee presently has perfected property rights in—such equipment as was purchased from Rextrusion, "and all additions, accessions, and substitutions ..."

As to two $25,000 "embosser units" which were purchased from Eastern Engraving, the Bank argues that such units were accessions to the "embosser drives" purchased from Rextrusion. However, the testimony at trial indicated that the "drives," or control panels, were accessions to the unit mainframes; conversely, the "units" were not accessions to the control panels.

As to the $85,000 "regrind line" purchased from Sterling, the Bank argues that since Kors and the Bank originally contemplated a "regrind capability" in connection with one "extruder," and since the security agreements and financing statements as to which SBIC subordinated its interest reflect "extruders," the "regrind line" is "a substitution covered by the express terms of the Howard Bank security interest." The Court does not agree: SBIC subordinated its interest to the Bank with respect to five certain extruders; Kors owned these five certain extruders, plus the regrind line. Thus, the "line" was not a substitution for an extruder; moreover, SBIC did not agree to subordinate to a "regrind capability."

As to the $45,000 "slitting machine," the argument is made that such machine was purchased from the proceeds of sale of a prior slitting machine financed by the Bank. However, SBIC did not subordinate itself to the Bank as to any slitting machine; thus it is irrelevant that the $45,000 machine may be considered "proceeds" of the original slitting machine.

As to "Sundry Equipment" conveyed by the trustee, the documentation shows that SBIC subordinated itself to a "Lemo Stamp-our HVS 500," a "Lemo Blocking Table HBS 500," an "Air Compressor," and an "HPS 500 V. Punch." The documents in the case do not indicate that SBIC subor-

dinated to the Bank with respect to any other sundry equipment conveyed.

SBIC argues that it has rights in certain "miscellaneous items conveyed" on the basis of its "machinery and equipment" security interest. The testimony at trial established that most of the miscellaneous items conveyed were, in fact, pieces of machinery or equipment. On this basis, such miscellaneous items as were machinery or equipment properly falls within SBIC's security interest.

The Trustee has requested the Court that the proceeds received from the sale of the property and held by the bank; i.e., $1,000,000.00 should be subject to interest from the date of the sale on April 22, 1982, part of which should inure to the benefit of the debtor's estate. His position is not tenable. The Stipulation executed by the parties makes no provision for the payment of interest even though the Bank did in fact have the use of the money. In addition, the Trustee introduced no testimony to substantiate his claim to interest.

■ The Bank and SBIC consented to the sale of the Debtor's property and the Trustee agreed that the Bank could as part of the sale to Hilinex retire $1,000,000.00 of RIDC's indebtedness and finance this sum as part of the Hilinex purchase price. At this time the Trustee could have insisted on the payment of interest on this money but failed to do so. In general the law allows interest only on the ground of a contract express or implied. 33 C.J. 182 § 13.

"One receiving money which he is obligated to pay to a third person is not liable to the latter for interest if, being under no obligation to do so, he does not put the money out at interest, but if he does so, the interest is considered to have the same ownership as the principal by which it is produced. An agent holding money or property belonging to another as an indemnity is not chargeable with interest, and one with whom money is deposited, to be paid over to the party entitled thereto as soon as the question of title is determined, generally is not chargeable with interest, even though he

may have used the money as his own." 45 AmJur 2d 42 § 39.

■ It follows that The Bank is not chargeable with interest on the $1,000,-000.00 which was part of the purchase price.

The Court is aware that The First National Bank of Boston is claiming a super priority administrative expense pursuant to § 507(b) of the Bankruptcy Code, but this is a matter which the Court is setting for a separate hearing and determination.

## CONCLUSIONS

RIDC and the Bank are general creditors in this proceeding. SBIC's enforceable security interest extends to:

(1) The Sterling regind line and accessories thereto;

(2) The embosser units with rollers and accessories thereto including the unwind and edge guides but not including the embosser drives;

(3) The $45,000 slitting machine;

(4) All "sundry equipment" sold excluding the Lemo HVS 500, the Lemo HBS 500, the HPS 500 V Punch, and the air compressor;

(5) The office equipment sold by the Trustee for the sum of $3,324.00; and

(6) The "miscellaneous items conveyed".

In view of the numerous questions presented, none of which were routine, it would be inappropriate to award costs, expenses, or attorney's fees to any party. Further, The Howard Bank shall not be chargeable with interest.

The parties failed to establish the value of some of the equipment sold by the Trustee and, accordingly, the Judgment Order being entered shall provide for payment of the fair market value.

The Clerk shall enter Judgment in accordance with this Memorandum Opinion.